IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KAREN TITMAN,                              )     CASE NO. 1:17-cv-01728
                                           )
              Plaintiff,             )     JUDGE PATRICIA A. GAUGHAN
                                           )
        v.                            )     MAGISTRATE JUDGE
                                           )     KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                     )
SECURITY ADMINISTRATION,                   )
                                           )     **REPORT AND RECOMMENDATION**
              Defendant.             )

      Plaintiff Karen Titman ("Plaintiff" or "Titman") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant

to Local Rule 72.2.

      For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

      Titman protectively filed[1] an application for Disability Insurance Benefits on March 25,

2014, alleging a disability onset date of December 4, 2009.  Tr. 12, 225-231, 247.  She alleged

disability due to gall bladder removal, IBS symptoms, melanoma removed, lymph nodes

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 8/13/2018).

1

removed, circulation problems in legs and arms, macular holes in both eyes, nerve damage to left arm, anxiety, endometriosis/fibroid tumor, and lower back problems.  Tr. 148, 160, 176, 184, 251.  After initial denial by the state agency (Tr. 176-179) and denial upon reconsideration (Tr. 184-190), Titman requested a hearing (Tr. 191-194).  A hearing was held before Administrative Law Judge Frederick Andreas ("ALJ") on March 10, 2016.  Tr. 118-147.

In his June 23, 2016, decision (Tr. 9-31), the ALJ determined that Titman had not been under a disability from December 4, 2009, through December 31, 2014, her date last insured (Tr. 12, 26).  Titman requested review of the ALJ's decision by the Appeals Council.  Tr. 223-224.  On June 20, 2017, the Appeals Council denied Titman's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Titman was born in 1979.  Tr. 124, 225.  At the time of the hearing, Titman lived with her grandmother and uncle.  Tr. 130.  She graduated from high school and also obtained a certificate for completing one year of graphic art at a vocational school.  Tr. 252.  Titman's past work included work as an administrative office assistant/office clerk from 2001 through 2009 at Carolina Building Group, Inc.  Tr. 25, 124-125, 137-138, 232.  Titman stopped working in 2009.  Tr. 314.  She was laid off and the company then went out of business.  Tr. 314.  Titman collected unemployment until around March of 2012.  Tr. 314.

### B.    Medical evidence

#### 1.  Treatment history

As summarized herein, Titman was diagnosed with and treated for various medical conditions.  While there is medical opinion evidence regarding mental health impairments

(discussed below), there do not appear to be mental health treatment records during the relevant period.

In 2006, Titman underwent treatment for stage three melanoma.  Tr. 340.  She had her lymph nodes removed in 2006 and was released from oncology in 2011.  Tr. 340.

On July 9, 2009, Titman was seen by Girish S. Munavalli, M.D., M.H.S., of the Dermatology, Laser & Vein Specialists of the Carolinas for symptomatic venous insufficiency and severe pain in both legs.  Tr. 498.  Titman complained of persistent leg pain, cramping, and throbbing, tired and heavy leg.  Tr. 498.  She explained that, after sitting at work for long periods of time, her legs would start to throb and ache and she would experience cramping at night and it would disrupt her sleep.  Tr. 498.  Her symptoms were increased with extended periods of standing or sitting and decreased with rest and elevation.  Tr. 498.  To alleviate the symptoms she had also been increasing use of analgesics over the prior two years but her attempts had become largely ineffective.  Tr. 498.  Dr. Munavalli diagnosed pain in limb, spider veins, venous insufficiency, and edema of the lower extremity and recommended duplex imaging of both legs to determine a definitive treatment plan and he recommended that they proceed with a trial of conservative therapy of wearing of prescription grade compression hose for symptomatic relief, elevating her legs and using analgesic medication (Advil/Motrin 400 mg, 1-2 day when needed).  Tr. 498.

On July 22, 2009, a bilateral ultrasound of Titman's lower extremities was performed.  Tr. 493-497.  Dr. Munavalli diagnosed pain in limb, spider veins, venous insufficiency, varicose vein symptomatic, and edema of the lower extremity.  Tr. 497.  Dr. Munavalli continued to recommend conservative therapy of prescription compression hose for symptomatic relief, elevation of legs and use of analgesic medication (Advil/Motrin 800 mg every day when

3

needed).  Tr. 497.  Dr. Munavalli provided Titman with a pair of 30-40 mm thigh high compression hose and recommended reevaluation in six months.  Tr. 497.

Titman saw Dr. Munavalli for follow up on February 11, 2010.  Tr. 491-492.  Titman relayed that the conservative measures she had been using were no longer effective and her symptoms were interfering with her daily activities.  Tr. 491.  Titman's job involved sitting at a computer for long periods which was causing pain and throbbing in her legs.  Tr. 491.  She felt her condition was getting worse, noting that her veins were getting bigger/larger.  Tr. 491.  Dr. Munavalli diagnosed pain in limb, spider veins, venous insufficiency, and edema of the lower extremity.  Tr. 491.  Since conservative therapies were not effectively improving her symptoms, Dr. Munavalli recommended that Titman proceed with Endovenous Ablation therapy with injections and he noted that she may need sclerotherapy for remaining symptomatic residual varicosities.  Tr. 491.  There no indication that Titman proceeded with the recommended procedures.

In 2013, Titman saw Lillian Lopez, D.O., of the Cleveland Clinic to establish a primary care relationship.  Tr. 340.  Titman had relocated from North Carolina to Ohio.  Tr. 340.  During that visit, Dr. Lopez recommended that Titman consult with dermatology regarding the melanoma of her left arm since Titman had not had a full body skin check for a year and there was a suspicious lesion on Titman's left arm.  Tr. 340, 341.  The removal of Titman's lymph nodes caused some nerve damage.  Tr. 340, 341.  Titman reported taking hydrocodone for the nerve damage.  Tr. 340, 341.  Titman wore a compression sleeve on her left arm to help with the pain.  Tr. 133-134.  The compression sleeve did not relieve all of Titman's pain.  Tr. 134.  In February 2013, upon Dr. Lopez's referral, Titman saw Antoine Amado, M.D., in the dermatology department for a skin check.  Tr. 343-344.  Dr. Amado planned to review Titman's

4

past skin biopsy results; and recommended periodic self-skin examinations, sun protection, and follow up every six months.  Tr. 344.

Titman continued to follow up with Dr. Amado.  Tr. 357-359 (8/14/2013), Tr. 360-362 (6/24/2014), Tr. 407-408 (12/18/2014).  During the August 2013 follow-up visit, Dr. Amado observed swelling of Titman's left forearm and hand, with no redness, which Dr. Amado felt was secondary to her 2006 lymph node removal and he recommended that Titman follow up with her primary care physician.  Tr. 357-358.  In June 2014, Titman had no new lesions or changing moles.  Tr. 360.  She had recently gone to the beach and tanned.  Tr. 360.  Dr. Amado continued to observe swelling of Titman's left forearm and recommended sun protection and periodic self-skin examination.  Tr. 360.  During the June 2014, visit, Titman complained of back pain and nausea and Dr. Amado advised Titman to follow up with her primary care physician regarding those complaints.  Tr. 360.  During a December 2014 visit with Dr. Amado, Titman relayed that she was concerned about an itchy mole on her left forearm.  Tr. 407.  Dr. Amado removed a portion of the lesion for testing and informed Titman to call in a few weeks for results.  Tr. 407-408.

During an October 25, 2013, eye examination, Titman reported that she was self-employed doing cleaning.  Tr. 320.  During various medical visits during 2013, Titman reported having no difficulty with completing routine daily living activities.  Tr. 342, 346, 349, 353, 359.

During a June 24, 2014, visit with Dr. Lopez, (Tr. 363-368), Titman complained of right arm pain with most of the pain located between her wrist and elbow, some weakness in her right arm and tingling and numbness in her hands and fingers (Tr. 365).  She also complained of pelvic pain radiating to her back, which she planned to address with her gynecologist at a follow up appointment.  Tr. 363, 365.  A physical examination of Titman's right upper extremity

5

produced tingling/burning pain from her wrist to the middle area of her forearm; she had 5/5 muscle strength, including grip strength and her range of motion was within normal limits.  Tr. 365.  Dr. Lopez assessed right arm pain and recommended that Titman wear wrist splints except when bathing or washing dishes and she prescribed a methylprednisolone dose pack.  Tr. 365.  If Titman was not doing better in two weeks, Dr. Lopez planned to refer Titman to neurology.  Tr. 365.

On August 14, 2014, upon Dr. Lopez's referral, Titman saw Joseph Zayat, M.D., in the neurology department, with her chief complaint being numbness in her right hand.  Tr. 376-380.  On physical examination, Phalen and Tinel tests were positive on the right.  Tr. 379.  Otherwise, her physical examination produced generally normal results, including normal range of motion in the spine; intact muscular strength; no joint swelling, deformity or tenderness; and normal sensation.  Tr. 379-380.  Dr. Zayat's impression was right carpal tunnel for which she had been using a brace with partial improvement, and he felt that it was not likely that Titman had cervical radiculopathy.  Tr. 380.  Dr. Zayat recommended an EMG of Titman's right upper extremity to establish a diagnosis and assess the intensity of the findings.  Tr. 380.  October 7, 2014, EMG results were consistent with a clinical diagnosis of right carpal tunnel syndrome, electrically moderate.  Tr. 382.  It is not clear what further follow up occurred with respect to Titman's carpal tunnel syndrome.

Titman saw Dr. Lopez on September 30, 2014 Tr. 389-391.  Titman complained of low back pain that she had been having for three years, indicating that it had become progressively worse over the prior six months.  Tr. 390.  Titman explained that any type of movement aggravated the pain and the pain was waking her up.  Tr. 390.  She described the pain as aching and pulling and radiating into the low-mid posterior thigh at times.  Tr. 390.  She denied

numbness, tingling, weakness in her legs, or bladder/bowel concerns.  Tr. 390.  Over-the-counter Motrin was helping alleviate her pain and moist heat helped as well.  Tr. 390.  A physical examination showed no acute distress, a normal gait, no tenderness to palpation of the lumbar or para lumbar areas, no gluteal pain bilaterally, negative straight leg raise, 5/5 muscle strength in the lower extremities, and patellar reflexes were within normal limits.  Tr. 390.  A lumbar spine x-ray was normal.  Tr. 391, 393.  Dr. Lopez diagnosed chronic low back pain and left lumbar radiculopathy – intermittent, noting that no signs of radiculopathy were observed during the visit that day.  Tr. 391.  Dr. Lopez recommended that Titman rest, as needed; use warm moist heat; perform low back exercises as directed; and use analgesics.  Tr. 391.  Dr. Lopez indicated that, if Titman was not better with home physical therapy, she would refer Titman to outpatient physical therapy.  Tr. 391.

During a December 5, 2014, visit with Dr. Lopez, Titman was experiencing pain in her left arm due to melanoma (skin tag removal); she had chronic swelling in her left upper extremity.  Tr. 402-403.  Titman indicated that her compression sleeve was old and she was interested in getting a new one.  Tr. 403.  Titman was also interested in reestablishing care with oncology to determine whether she should be having PET scans.  Tr. 403.  Titman complained of chronic back pain and was interested in seeing Dr. French, a chiropractor.  Tr. 403.  On physical examination, Dr. Lopez observed swelling in Titman's left upper extremity.  Tr. 403.  Dr. Lopez provided Titman with a prescription for a compression sleeve and provided her with referrals for physical therapy, oncology and a chiropractor.  Tr. 403.

Titman saw Dr. French at French Chiropractic and Wellness Center on December 11, 2014.  Tr. 422-424.  Titman relayed that her main symptom was back pain.  Tr. 423.  She also

reported left shoulder blade and pelvic pain.  Tr. 424.  Titman continued with chiropractic treatments through at least October 2015 for her lower back and lower extremities.  Tr. 427-467.

On December 17, 2014, Titman saw Amy Kundrat, PT, for a physical therapy evaluation regarding her left arm pain.  Tr. 544-547.  Titman relayed that she was right-hand dominant but had been using her left hand more due to carpal tunnel.  Tr. 544.  She reported having trouble holding up a pan.  Tr. 544.  Her symptoms were worse at the end of the day and based on positions.  Tr. 544.  Her symptoms were better after elevation.  Tr. 544.  She reported functional limitations when dressing, reaching behind her back, reaching overhead, sleeping on her left side and using her hand with her arm at shoulder level.  Tr. 544.  Titman relayed that she occasionally used a treadmill.  Tr. 544.  Titman wanted to decrease the edema and pain and get fitted for a new brace.  Tr. 544.  Ms. Kundrat recommended that Titman proceed with physical therapy and indicated that Titman's progress was good due to "good overall health status."  Tr. 547.

Titman saw Dr. Lopez on January 25, 2016, for a routine general medical examination.  Tr. 412-413.  Titman complained of left foot pain and was interested in having her vitamin levels checked.  Tr. 412.  On physical examination, Dr. Lopez observed normal movement in Titman's spine, normal upper extremity examination except for the left upper extremity which Dr. Lopez noted was edematous and wrapped in an ACE bandage, and normal lower extremity examination.  Tr. 413.  Dr. Lopez advised continue with regular aerobic exercise, maintain a normal weight, and follow up for her annual examination in one year.  Tr. 413.  A vitamin deficiency screening was ordered and a referral to podiatry was provided.  Tr. 413.

On February 6, 2015, Ms. Kundrat saw Titman for the seventh out of seven physical therapy visits.  Tr. 575-577.  Titman was fitted for a compression sleeve and glove but had not ordered it yet.  Tr. 575.  Titman reported improvement in using her arm overhead and with her

functional activities and she noted less discomfort in her arm.  Tr. 575.  Ms. Kundrat noted some

increased fluid in Titman's arm during the visit but noted that Titman had not had her arm

wrapped in a week because of missed appointments due to weather.  Tr. 577.  Titman indicated

she would be ordering the compression sleeve and glove that day.  Tr. 577.  Ms. Kundrat

wrapped Titman's arm again to prevent her from gaining girth while awaiting the compression

sleeve.  Tr. 577.  Titman was discharged from physical therapy due to goal achievement and

maximal physical therapy benefit.  Tr. 577.  Titman was advised to continue with a home

exercise program.  Tr. 577.

Titman saw Dr. Lopez on October 29, 2015, for medical concerns and to have disability

forms completed.  Tr. 590-594.  Titman complained of chronic pain in her left arm and she

requested a referral to physical therapy for her left arm.  Tr. 590.  She also complained of having

pain and spasms in the back of her left leg that started two weeks earlier.  Tr. 590.  She denied

any injury that would have caused the pain but noted that it was possible she might have done

something while cleaning or moving something at home.  Tr. 590.  Titman relayed that Dr.

French advised her that she has degeneration in her lumbar spine.  Tr. 590.  Titman reported

decreased muscle strength in her left leg but she denied numbness or issues with bladder/bowel

control.  Tr. 590.  On examination, Dr. Lopez observed that Titman was alert, cooperative, in no

acute distress, and had an antalgic gait.  Tr. 591.  Titman was not tender to palpation in the

lumbar spine or para lumbar muscles but she was tender to palpation in the left buttock.  Tr. 591.

Straight leg raises were negative; Titman had 5/5 muscle strength in her extremities; and her

patellar reflexes were 2+ bilaterally.  Tr. 591.  Dr. Lopez provided a physical therapy referral for

Titman's arm and she recommended that Titman continue with her monthly chiropractic

treatments for her lumbosacral spondylosis without myelopathy and apply moist heat and take

9

medications (cyclobenzaprine and naproxen) for her left-sided low back pain with left-sided sciatica.  Tr. 591.

### 2. Opinion evidence

*Treating physician*

On October 29, 2015, Dr. Lopez completed two medical source statements – one relating to Titman's mental impairments (Tr. 470-472)[2] and one relating to Titman's physical impairments (Tr. 473-475).[3]

***Physical impairments***

In the medical source statement regarding Titman's physical impairments, Dr. Lopez opined that Titman could rarely lift/carry one to five pounds and she could never lift more than five pounds; she could reach constantly with her right hand/arm and occasionally with her left hand/arm; she could handle frequently with her right hand and occasionally with her left hand; she could finger constantly with her right hand and frequently with her left hand; she could stand for a total of four to five hours and for thirty to forty minutes at one time; she could walk for a total of four to five hours and for thirty to forty minutes at one time; she could sit for a total of six hours and for 2 hours at one time; she could use her feet for repetitive movement such as operating foot controls; she could occasionally bend and climb steps; she could frequently

---

[2] The available rating choices were – "none," meaning no limitations; "mild," meaning unable to function in this area less than ten percent of the workday or workweek; "moderate," meaning unable to function in this area from eleven percent to twenty-five percent of the workday or workweek; "marked," meaning unable to function in this area from twenty-six percent to fifty percent of the workday or workweek; and "extreme," meaning unable to function in this area over fifty percent of the workday or workweek.  Tr. 470.

[3] The available rating choices were – "none;" "rare," meaning no more than 10 percent of the day – less than one hour per day; "occasionally," meaning up to one-third of the time – up to two-and-one-half to three hours per day; "frequently," between one-third and two-thirds of the time – from two-and-one-half or three hours to five-and-one-half hours per day; and "continuously."  Tr. 473.

crouch/squat and crawl; she could never climb ladders; and she could reach above shoulder level with her right extremity but not with her left extremity.  Tr. 473-474.

Dr. Lopez opined that, if asked to perform work beyond the limitations noted, Titman's condition would likely deteriorate.  Tr. 474.  Dr. Lopez indicated that Titman's condition existed and persisted with the restrictions noted since at least December 4, 2009.  Tr. 475.  Dr. Lopez opined that, if asked to perform work beyond the limitations noted, Titman would likely have absences from work more than five days per month.  Tr. 475.  Dr. Lopez explained that her assessment was based on her diagnosis of lymphedema of upper extremity, nerve damage, and lumbosacral spondylosis without myelopathy.  Tr. 475.

### *Mental impairments*

In the medical source statement regarding mental impairments, Dr. Lopez opined that Titman had either no or mild limitations in the areas of social interaction, sustained concentration and persistence, and adaptation.  Tr. 470-472.

### *Consultative examining physician*

### *Physical impairments*

On June 12, 2014, Dorothy A. Bradford, M.D., saw Titman for a consultative physical evaluation.  Tr. 325-328, 329-332.  Titman's manual muscle testing was normal with the exception of her ability to grasp with her left hand.  Tr. 325-328.  Dr. Bradford noted that Titman was unable to open a jar with her left hand.  Tr. 326.  As part of her physical examination, Dr. Bradford observed no edema or varicosities of the extremities.  Tr. 330.  Following her evaluation and testing, Dr. Bradford opined that:

> Claimant has mild lymphedema of the left upper extremity due to axillary lymph node removal for melanoma.  ROM is normal and no pain or tenderness was elicited.  Hand clasp is 4/5.  She is right handed.

In my medical opinion there are no activity restrictions.

Tr. 331.

### *Mental impairments*

#### <u>Dr. Goshtasbpour</u>

On March 8, 2012, Farangis Goshtasbpour, Ph.D., saw Titman for a consultative psychological evaluation.  Tr. 313-318.  Titman relayed suffering from anxiety and depression since her cancer diagnosis in 2006.  Tr. 314.  She also reported having panic attacks that came from nowhere without warning.  Tr. 314.  Titman relayed that she enjoyed playing computer games and stated that, in the prior month, she performed a lot of indoor chores but no outdoor chores.  Tr. 314.  During the day, Titman reported watching about three hours of television and spending about eight hours online.  Tr. 314.  Titman indicated she had friends but she did not socialize a lot.  Tr. 314.  Titman reported receiving medication for her mental health issues from her primary care physician.  Tr. 315.  She relayed that she had not been hospitalized for psychiatric reasons.  Tr. 315.  She reported that she was planning on starting mental health treatment.  Tr. 315.  Dr. Goshtasbpour diagnosed Titman with panic disorder and summarized his findings as follows:

> It is estimated that Ms. Titman is currently functioning in the average rang[e] of intelligence with fair insight.  She denied having any memory and concentration problems and her responses in the Cognitive Responses portion supported this fact.  The claimant's response style appears to be truthful based on her response to the arbitrary questions.
>
> ***
>
> [C]laimant is able to understand, retain, and follow simple written and verbal instructions well.  It seems she has the ability to sustain attention long enough to perform simple or repetitive tasks.  Based on her past work history, it does not appear that she would have any interpersonal difficulties with fellow workers and/or supervisors.  Psychologically, Ms. Titman presents as someone who would

be able to tolerate the stress and pressures associated with day-to-day work activities.

Tr. 317.

### *Dr. DeCola*

On June 16, 2014, Louis A. DeCola, Jr., Ph.D., saw Titman for a consultative psychological evaluation.  Tr. 305-310.  Titman relayed that her chief complained was the problems she had with her left arm.  Tr. 306.  She noted that she was also starting to have problems with her right arm.  Tr. 306.  She relayed being sexually abused when she four to six years of age and having therapy from ages six to eight.  Tr. 306.  Titman relayed it was hard for her to find work because her "arm is always throbbing and I am unable to move it well…I am unable to lift over 5 pounds. . . and my right arm is starting to hurt from my elbow to my fingers…"  Tr. 307 (alterations in original).  She indicated she attempted to work in 2014 at a housekeeping position but was unable to work more than two weeks because her arm problems prevented her from doing the work.  Tr. 307.  Titman relayed that she had never been hospitalized for mental health issues.  Tr. 307.  Her primary care physician had prescribed medication for her anxiety in the past but, at the time of Dr. DeCola's evaluation, Titman was not taking any medication for her mental health issues but indicated that she had not been feeling well mainly due to her worrying about her physical problems.  Tr. 307.  Titman described her daily activities, indicating that she wakes around 10:00 a.m., cooks breakfast for herself, calls her grandmother, uses the computer and Facebook, sometimes cooks dinner for the family, occasionally sees or visits with a friend, and usually goes to bed around 2:00 a.m. Tr. 307.

Dr. DeCola found that Titman's affect and mood appeared mildly to moderately depressed and anxious.  Tr. 308, 309.  He diagnosed adjustment disorder with mixed anxiety and depressed mood.  Tr. 309.  Dr. DeCola indicated that Titman's reported history suggested that

"most recently she has been depressed and anxious due to health and financial and work concerns.  Mild to moderate dysphoric mood can remit if health gets better and/or her ability to cope with concerns increases."  Tr. 309.

Dr. DeCola provided his opinions regarding Titman's functional abilities.  Tr. 310.  In the area of understanding, remembering and carrying out instructions, Dr. DeCola found that Titman's intellectual functioning appeared to be in the average range.  Tr. 310.  He proceeded to indicate that "She is expected to not be able to understand, remember, and apply verbal instructions in the work setting consistent with average intellectual functioning."  Tr. 310.  Considering Dr. DeCola's prior finding, i.e., that Titman's intellectual functioning appeared to be in the average range, it appears that the inclusion of "not" may be a typographical error.  Also, the ALJ concluded that Dr. DeCola opined that Titman was "expected to be able to understand, remember, and apply verbal instructions in the work setting consistent with average intellectual functioning[]" (Tr. 20) and Titman does not challenge this finding.

Dr. DeCola also opined that Titman would likely perform about average in maintaining persistence and pace, maintaining concentration and attention, and performing simple and multi-step tasks but he noted that she apparently could have problems if anything involved having to use her arms.  Tr. 310.  Dr. DeCola noted no limitations in Titman's ability to respond appropriately to supervision and to coworkers in a work setting.  Tr. 310.  Due to Titman's identified physical problems and apparent mood problems, Dr. DeCola opined that Titman was expected to respond at least somewhat below average to workplace pressures.  Tr. 310.

14

*State agency reviewing physicians*

**Physical impairments**

On August 13, 2014, state agency reviewing physician William Bolz, M.D., completed a review and concluded that there was no severe physical impairment.  Tr. 167.

Upon reconsideration, on November 4, 2014, state agency reviewing physician Leon D. Hughes, M.D., completed a Physical RFC Assessment.  Tr. 155-156.  Dr. Hughes opined that Titman could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull unlimitedly except as shown for lift and/or carry.  Tr. 155.  Dr. Hughes found postural limitations, i.e., frequently climbing ramps/stairs, balancing, kneeling, and crawling; and occasionally climbing ladders/ropes/scaffolds, stooping, and crouching.  Tr. 155.  Dr. Hughes found no manipulative, visual, communicative or environmental limitations.  Tr. 155-156.

**Mental impairments**

On July 9, 2014, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT").  Tr. 167-168.  In the PRT, Dr. Tangeman opined that Titman had mild restrictions in activities of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration.  Tr. 168.

Dr. Tangeman also completed a Mental RFC Assessment.  Tr. 170-171.  Dr. Tangeman opined that Titman had no limitations in the areas of understanding and memory, social interaction, or adaptation.  Tr. 170.  In the area of sustained concentration and persistence, Dr. Tangeman opined that Titman was moderately limited in her ability to maintain attention and

15

concentration for extended periods and in her ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods.  Tr. 170.

Considering these limitations, Dr. Tangeman explained that Titman remained able to

comprehend, remember and carry out simple (1-2 step) and occasional complex (3-4 step)

instructions.  Tr. 170.

Upon reconsideration, on November 12, 2014, state agency reviewing psychologist

Aracelis Rivera, Psy. D., completed a PRT (Tr. 153) and Mental RFC Assessment (Tr. 156-157),

reaching the same conclusions as Dr. Tangeman.

**C.      Hearing testimony**

**1.      Plaintiff's testimony**

Titman was represented at the hearing and testified regarding her impairments.  Tr. 123-

136, 137, 143-146.  When the ALJ asked Titman why she felt she was unable to work, Titman

stated that problems with her back make it difficult and painful for her stand and sit.  Tr. 127.

She indicated that, after about a half an hour, it is hard to stand and she can only sit for a couple

of hours.  Tr. 127.  After standing for about half an hour, Titman has to sit down for about half

an hour to stop the pain in her back.  Tr. 134.  Then, if she needs to, she can stand up again.  Tr.

134.  Also, she indicated that she had problems with her hands, especially her left hand, which

she pretty much could not do anything with at all.  Tr. 127.  Titman indicated she cannot lift

anything and, sometimes, she has pain in her arm with just sitting.  Tr. 127.  After having

procedures relating to her melanoma on her left arm, she has had nerve damage and numbness in

that arm and back into her shoulder.  Tr. 135-136.  She wears a compression sleeve on her arm.

Tr. 127.  Titman also explained that venous problems with her legs make even sitting difficult for her.  Tr. 127.

Titman explained that during the day she spends a lot of time in a recliner.  Tr. 127. After sitting for a while, she will have to get up and walk around for about fifteen minutes to move the muscles in her back.  Tr. 128.  When she is sitting she elevates her legs to help take the pressure off of her legs and back.  Tr. 128.  She also wears compression stockings on her legs and will take a really hot bath in order to get some relief from the pain.  Tr. 128.  During the day, Titman watches television or naps.  Tr. 131.  She does not sleep well at night because of the pain in her back.  Tr. 131.  For her pain, Titman takes over-the-counter medication like Advil or Aleve and she also sees a chiropractor.  Tr. 132, 134-135.  Because Titman does not get a lot of sleep, it is hard for her to function mentally throughout the day.  Tr. 132.  Also, she is depressed, indicating that she has lost interest in doing a lot of things she used to do in life.  Tr. 132. Titman indicated that she saw Dr. Lopez for her depression.  Tr. 132-133.  She does not attend any counseling or mental health therapy.  Tr. 135.  Titman noted that Dr. Lopez had recently left the office so she was going to need to find a new physician.  Tr. 132-133.

As far as housework, Titman indicated that the only thing she can do is wipe down counters.  Tr. 129, 143.  Her uncle does most of the housework and cooking.  Tr. 130-131. Titman can prepare something simple like a sandwich.  Tr. 131.  She explained that her hands are her biggest problem because she cannot lift anything with her left and her grip, especially on the right, is really bad.  Tr. 129.  As far as her ability to lift, she cannot lift a jar of pickles or gallon of milk with her left arm.  Tr. 130.  She has difficulty even lifting things with both arms because of the problems with her ability to grip with her right arm/hand.  Tr. 130.  Titman has problems opening bottles with her right hand or doing anything that involves twisting.  Tr. 130.  She has

dropped things that are too heavy.  Tr. 130.  She has gone to physical therapy for her left arm

pain.  Tr. 133.  She also wears a compression sleeve, which causes some pain itself but, if she

does not wear it, the pain will get worse.  Tr. 134.  As far as Titman's carpal tunnel in her right

hand, her doctor has recommended that she continue with injections.  Tr. 144.

### 2.  Vocational expert's testimony

Vocational expert Ted Macy testified at the hearing.  Tr. 136-143.  The VE described

Titman's past work as an office clerk, a light, semi-skilled job that Titman performed at the

medium level.  Tr. 138.

The ALJ asked the VE to assume a hypothetical individual of Titman's age, education

and vocational background who could perform sedentary work with additional limitations of

frequently climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; frequently

balance, kneel or crawl; occasionally stoop or crouch; frequently handle and finger; and would

be able to remember and carry out simple and one and two step and occasional complex three

and four step instructions.  Tr. 138-139.  The VE indicated that Titman's past work would not be

available to the described individual but there would be sedentary, unskilled jobs available,

including table worker, final assembler, and bonder.  Tr. 139.

The ALJ then asked the VE to assume the first hypothetical individual but with the

additional lifting limitation, i.e., only able to lift five pounds with the left non-dominant arm.  Tr.

140.  The VE indicated that, as long as the other arm was still capable of lifting up to ten pounds,

then the three jobs previously identified would remain available to the described individual with

the additional lifting limitation.  Tr. 140.

Titman's counsel asked the VE to assume the ALJ's first hypothetical but to change the

handling and fingering limitation from frequent to occasional.  Tr. 141.  With that modification,

the VE indicated that there would be no jobs available.  Tr. 141.  The VE also indicated that if

the individual described in the first hypothetical needed to have the ability to elevate her feet to

chest level there would be no jobs available to the individual.  Tr. 141.  The VE also indicated

that there would be no jobs available for an individual if the individual needed two additional 15

minute breaks, in addition to regular breaks, or if the individual would consistently need two

absences per month to attend medical appointments or due to symptomology.  Tr. 142.  If the

ALJ's hypothetical regarding lifting restrictions was modified to limit the individual to lifting

five pounds bilaterally, the VE indicated there would be no jobs available.  Tr. 142-143.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[4] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his June 23, 2016, decision, the ALJ made the following findings:[5]

1.      Titman last met the insured status requirements on December 31, 2014.  Tr. 14.

2.      Titman did not engage in substantial gainful activity during the period from his alleged onset date of December 4, 2009, through her date last insured of December 31, 2014.  Tr. 14.

3.      Through the date last insured, Titman had the following severe impairments: degenerative disc disease, adjustment disorder with mixed anxiety and depressed mood, mild lymphedema of the left upper extremity

---

[5] The ALJ's findings are summarized.

due to axillary lymph node removal for melanoma, and carpal tunnel syndrome on the right. Tr. 14-15. Titman had the following non-severe impairments: macular holes in both eyes with 20/20 vision with correction, endometriosis/fibroid tumor with no evidence of ongoing functional limitations, allegation of irritable bowel syndrome with evidence of normal colonoscopy and a normal endoscopy, and gallbladder removal in 2005 with no evidence of resulting functional limitations. Tr. 15.

4. Through the date last insured, Titman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 15-17.

5. Through the date last insured, Titman had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she could frequently climb ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequently balance, kneel, or crawl; occasionally stoop or crouch; could remember and carry out simple (1-2 step) and occasional complex (3-4 step) instructions; and should could frequently handle and finger. Tr. 17-24.

6. Through the date last insured, Titman was unable to perform any past relevant work. Tr. 25.

7. Titman was born in 1979 and was 35 years old, defined as a younger individual age 18-44, on the date last insured. Tr. 25.

8. Titman has at least a high school education and is able to communicate in English. Tr. 25.

9. Transferability of job skills was not material to the determination of disability. Tr. 25.

10. Through the date last insured, considering Titman's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Titman could have performed, including table worker, final assembler and bonder. Tr. 25-26.

Based on the foregoing, the ALJ determined that Titman was not under a disability at any time from December 4, 2009, the alleged onset date, through December 31, 2014, the date last insured. Tr. 26.

## V. Plaintiff's arguments

Titman argues that: (1) the RFC is not supported by substantial evidence because the ALJ did not account for Titman's limitations in concentration, persistence or pace and did not account for her limitations regarding her upper extremities (Doc. 18, pp. 6-10, Doc. 20, pp. 3-5); (2) the ALJ failed to properly evaluate the opinion of her treating physician Dr. Lopez (Doc. 18, pp. 11-14); and (3) the ALJ failed to recognize and consider Titman's venous insufficiency as a medically determinable impairment (Doc. 18, pp. 14-17, Doc. 20, pp. 2-3).

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.     The ALJ did not err in evaluating the opinion of Titman's treating physician**

Titman argues that the ALJ failed to properly evaluate the opinion of her treating physician Dr. Lopez.  Doc. 18, pp. 11-14.  In arguing that the ALJ failed to adhere to the treating physician rule, Titman appears to only challenge the ALJ's weighing of Dr. Lopez's medical source statement regarding Titman's physical impairments, not her mental impairments.  Titman argues that as her treating physician since 2013, Dr. Lopez, was able to consistently observe and oversee her progress and the ALJ incorrectly determined that Dr. Lopez's opinion was not supported by the record.  Thus, she contends that the ALJ should have assigned controlling or great weight to Dr. Lopez's opinion.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding[ ] . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id*

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in the case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ considered and weighed Dr. Lopez's opinion regarding Titman's physical impairments, stating:

> On October 29, 2015, primary care physician Lillian Lopez, D.O., completed a medical source statement form about the claimant's physical abilities.  Dr. Lopez opined that the claimant can "rarely" lift/carry 5 pounds and never lift/carry more than 5 pounds; occasionally reach with the left hand/arm; occasionally handle with the left hand; and the claimant would be absent from work 5 or more days per month due to her conditions or pain if asked to do more than the limitations she listed

(11F/5-7).  The undersigned gives limited weight to this opinion because it is not supported by the record including the objective medical evidence, clinical findings on examination, course of treatment, or the claimant's activities of daily living through at least the date last insured.

Tr. 24.

Contrary to Titman's position, the ALJ sufficiently explained the reasons why he assigned limited weight to Dr. Lopez's very restrictive functional assessment.  The ALJ discussed in detail Titman's treatment history, including relatively unremarkable physical examination findings.  Tr. 19-22, 325-331, 340, 347, 351, 365, 379.  Further, as indicated, the ALJ did not rely solely on the generally normal clinical findings when discounting Dr. Lopez's opinion.  The ALJ properly took into account evidence regarding Titman's daily activities.  Tr. 22-23, 24.  Titman contends that there is evidence in the record documenting complaints of chronic pain, swelling, weakness, and numbness in her bilateral upper and lower extremities and diagnoses in the record to support her claim that Dr. Lopez's opinion should have been provided greater weight.  However, the ALJ discussed and concluded that Titman's subjective allegations regarding the severity of her symptoms and limitations were not fully credible.  Thus, to the extent that Titman relies on her subjective complaints to support her claim that the ALJ did not properly weigh Dr. Lopez's opinion, her argument is unpersuasive.  Further, the ALJ considered, in detail, Titman's treatment history, including treatment for her arms, hands, legs, and back.  Tr. 18 (discussing venous insufficiency), Tr. 19, 20-21, 22 (discussing past melanoma treatment and issues with left arm), Tr. 21 (discussing carpal tunnel), Tr. 21, 22 (discussing back pain).  For instance, the ALJ considered left-arm physical therapy treatment records, noting that, with physical therapy, Titman showed improvement.  Tr. 575-577.  The ALJ also noted that, after consultations with Dr. Munavalli regarding her venous insufficiency and a recommendation that Titman proceed with Endovenous Ablation therapy and injections, it did not appear that Titman

proceeded with those procedures.  Tr. 18.  Moreover, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Here, Titman has not shown that the ALJ's decision to provide limited weight to Dr. Lopez's very restrictive functional limitations is not supported by substantial evidence or that the ALJ failed to provide good reasons for the weight assigned.  Accordingly, the undersigned recommends that the Court reject Titman's claim that the ALJ failed to comply with the treating physician rule when weighing the opinion of Dr. Lopez.

## C.      The RFC is supported by substantial evidence

Titman argues that the RFC is not supported by substantial evidence because the ALJ did not account for Titman's limitations in concentration, persistence or pace and did not account for her limitations regarding her upper extremities.  Doc. 18, pp. 6-10, Doc. 20, pp. 3-5.

As indicated, the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe*, 342 Fed. Appx. at 157. Further, In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding[ ] . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*; *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) (unpublished) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC").

### *Bilateral upper extremities*

Titman contends that the ALJ did not properly account for bilateral upper extremity limitations in the RFC.  Doc. 18, pp. 7-8, Doc. 20, pp. 3-4.  In support of her argument, she points to Dr. Bradford's finding that Titman had abnormal grasping skills because she could not open a jar with her left hand.  Doc. 18, p. 7.  As noted by Titman, the ALJ acknowledged Dr. Bradford's finding regarding the abnormal grasping.  Doc. 18, p. 8.  She contends that, because the ALJ provided some weight to Dr. Bradford's opinion, the ALJ should have explained why the grasping limitation was disregarded.  Doc. 18, p. 8.  Titman appears to ignore that, while Dr. Bradford observed limitations with respect to Titman's ability to grasp with her left hand, Dr. Bradford opined that no activity restrictions were warranted based on her evaluation.  Tr. 20, 331.  It was this opinion that the ALJ provided some weight to.  Tr. 20.  The ALJ, however, unlike Dr. Bradford, concluded that restrictions relating to Titman's physical impairments were warranted, and included in the RFC those restrictions that the ALJ found were supported by the record.

Titman also relies on Dr. Lopez's opinion which included more restrictive upper extremity limitations than those included in the RFC and Titman's own subjective statements regarding the extent of her limitations to argue that more restrictive RFC limitations were warranted.  Doc. 18, pp. 7-8.  As discussed above, the ALJ did not err in weighing Dr. Lopez's opinion.  Therefore, it cannot be said that the RFC is unsupported by substantial evidence because the ALJ did not include in the RFC restrictions set forth in Dr. Lopez's opinion.  Furthermore, the ALJ fully explained his reasons for not finding Titman's subjective allegations fully credible and Titman has not argued or shown that the ALJ's credibility determination is unsupported by substantial evidence.

Additionally, in formulating the RFC, the ALJ found that the opinion of state agency reviewing physician Dr. Hughes, which concluded that Titman was capable of light work with some postural limitations but no manipulative limitations, was generally consistent with the objective medical evidence, clinical examination findings and course of treatment and thus assigned the opinion considerable weight.  Tr. 23-24, 155-156.  However, the ALJ noted that some credit was due Titman's subjective complaints regarding her hands/arms and, therefore, reduced the range of sedentary work by including a limitation of frequent handling and fingering.[6]  Tr. 17, 23-24.

### Concentration, persistence or pace

Titman separately argues that the RFC is not supported by substantial evidence because the ALJ did not adequately account for limitations in concentration, persistence or pace.  Doc. 18, pp. 8-10, Doc. 20, pp. 4-5.  With respect to mental RFC limitations, the ALJ restricted Titman to remembering and carrying out simple (1-2 step) and occasional complex (3-4 step) instructions.  Tr. 17.  Titman contends that opinions from Dr. Goshtasbpor, the state agency reviewing psychologists, Dr. DeCola, and Dr. Lopez include mental limitations that are different than those included in the RFC, and therefore, the RFC is not supported by substantial evidence. Titman's argument falls short.

"Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed.

---

[6] As reflected in the ALJ's decision, even if more restrictive lifting restrictions had been included in the RFC, i.e., a five pound lifting restriction with the left non-dominant hand, the VE testified that jobs would remain available provided that the individual remained capable for lifting up to ten pounds with the other arm.  Tr. 26, 140.  The ALJ did not include this additional limitation in the RFC, however, because he found that such a severe limitation was not supported by the record.  Tr. 26.

Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  And, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

Thus, here, while the ALJ may not have adopted each and every limitation contained in opinions relating to Titman's mental health limitations, the ALJ was not required to.  The ALJ did not ignore the opinions nor did the ALJ fail to explain the weight provided to the opinions.  Moreover, Titman has failed to demonstrate that the mental limitations contained in the RFC are unsupported by substantial evidence.  For example, as acknowledged by Titman, Dr. Goshtasbpour opined that Titman had the ability to sustain attention long enough to perform simple or repetitive tasks.  Tr. 317.  Titman appears to take issue with there being no limitation in the RFC for repetitive tasks even though the ALJ assigned great weigh to Dr. Goshtasbpour's opinion.  Doc. 20, p. 4.  However, as indicated above, an ALJ is not required to adopt a physician's opinion verbatim.  Additionally, Dr. Goshtasbpour's opinion states "simple <u>or</u> repetitive," not simple <u>and</u> repetitive.  Tr. 317.

Titman also takes issue with the fact that the ALJ did not include certain limitations noted by the state agency reviewers.  Doc. 18, p. 10.  She argues that the ALJ did not include a limitation regarding Titman's ability to perform work without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Doc. 18, p. 10.  However, while the state agency reviewer found that Titman was

29

moderately limited in this area, they explained that, considering some moderate limitations in the areas of sustained concentration and persistence, Titman retained the ability to comprehend, remember and carry out simple (1-2 step) and occasional complex (3-4 step) instructions.  Tr. 156-157, 170.  The ALJ assigned great weight to the state agency reviewers' opinions and included limitations consistent with those opinions in the RFC.  Tr. 17, 24.

In a similar vein, Titman appears to contend that the RFC is not supported by substantial evidence because the ALJ did not include in the RFC a specific limitation included in Dr. DeCola's opinion, i.e., that Titman would be expected to respond "at least somewhat below average to workplace pressures."  Doc. 18, p. 9.  The ALJ assigned considerable weight to Dr. DeCola's consultative opinion.  Tr. 20.  However, as indicated herein, even where an ALJ assigns great weight to an opinion, an ALJ is not required to adopt the opinion wholesale.

Finally, Titman points to the opinion of Dr. Lopez, arguing that she also opined that Titman was limited in the area of concentration, persistence and pace.  Tr. 18, p. 9.  While Dr. Lopez did offer an opinion regarding Titman's mental limitations, she found no or mild limitations in all areas.  Tr. 470-471.  Thus, Titman has failed to demonstrate how Dr. Lopez's opinion required greater limitations than those included by the ALJ in the RFC.

For the reasons discussed herein, the undersigned recommends that the Court find that Titman has failed to demonstrate that the RFC is not supported by substantial evidence or that the ALJ erred by not including more restrictive limitations in the RFC.

**D.     Reversal and remand is not warranted based on the ALJ's consideration of Titman's venous insufficiency**

Titman argues that reversal and remand is warranted because the ALJ failed to recognize her venous insufficiency as a medically determinable impairment and therefore failed to give

consideration to her venous insufficiency when assessing her RFC.  Doc. 18, pp. 14-17, Doc. 20,

pp. 2-3.

Contrary to Titman's contention, the ALJ clearly considered Titman's diagnosis of

venous insufficiency and her treatment and allegations relating to said impairment.  The ALJ

stated:

> In terms of the claimant's alleged physical limitations, mental limitations, and
> symptoms including pain, a review of the record shows that on July 9, 2009, the
> claimant consulted with Girish Munavalli, M.D., for symptomatic venous
> insufficiency and severe pain in both legs.  The claimant complained of symptoms
> consistent with venous disease including persistent leg pain, cramping, throbbing,
> and tired/heavy legs.  The claimant had tried conservative measures including leg
> elevation and an increasing use of analgesics (Advil 400 mg) that had become
> largely ineffective.   Dr. Munavalli recommended duplex venous imaging of both
> legs to help formulate a definitive treatment plan (12F/23).
>
> On July 22, 2009, the claimant followed up with Dr. Munavalli after the venous
> duplex scan.   Dr. Munavalli diagnosed pain in limb, spider veins, venous
> insufficiency, varicose veins symptomatic, and edema of the lower extremity.  He
> recommended a trial of conservative therapy including wearing of prescription
> compression hose for symptomatic relief, elevation of the legs, and the use of
> analgesic medication, such as Advil/ Motrin 800 mg every day when needed.  Dr.
> Munavalli provided the claimant with a pair of 30-40 mm Hg thigh high gradient
> compression hose and he asked the claimant to return in six months (12F/18-22).
>
> On February 11, 2010, the claimant reported that conservative measures were no
> longer effective.  In response, Dr. Munavalli recommended Endovenous Ablation
> therapy with injections (12F/16).  However, it does not appear that the claimant
> underwent this procedure.

Tr. 18.

Whether or not the ALJ specifically mentioned venous insufficiency at Step Two, as is

clear, the ALJ considered Titman's venous insufficiency.  Moreover, he ALJ restricted Titman to

a reduced range of sedentary exertional work and Titman has failed to demonstrate how the

restrictive RFC does not adequately account for limitations associated with her venous

insufficiency.  Accordingly, the undersigned recommends that the Court find no basis upon

which to reverse or remand the Commissioner's decision based on the ALJ's consideration of

Titman's venous insufficiency.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

August 14, 2018                                     */s/ Kathleen B. Burke*
                                                   Kathleen B. Burke
                                                   United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).